NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of | : | Case No. 08-29020/JHW |
| Len E. Epstein | : | |
| Debtor | : | |
| Neil Epstein | : | Adversary No. 09-01074 |
| Plaintiff | : | |
| v. | : | **OPINION** |
| Len E. Epstein | : | |
| Defendant | : | |

APPEARANCES:    Christopher M. Manganello, Esq.
18 Pitman Avenue, Suite 104
Pitman, New Jersey  08071
Counsel for the Plaintiff

Bruno Bellucci, III, Esq.
747 Shore Road, P.O. Box 359
Linwood, New Jersey 08221
Counsel for the Debtor/Defendant

**FILED**

JAMES J. WALDRON, CLERK

February 14, 2011

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien,  Judicial Assistant to
Chief Judge Wizmur

In this matter, the plaintiff accuses his brother, the debtor/defendant, of fraudulently coercing him into agreeing to settle for less than his fair share of their mother's decedent's estate. The plaintiff alleges that the debtor failed to reveal significant and improper transfers from the decedent's assets to the debtor before she died, and asserts that he never would have agreed to compromise his share had he known the truth about the transfers. The plaintiff believes that the debtor's fraudulent acts have unfairly deprived him of

his originally intended 50% share of their mother's estate.  He seeks here a

determination that the disclaimer he executed regarding his share of his

mother's estate may be revoked, that the debtor owes him additional money to

satisfy his full inheritance, and that this debt is nondischargeable pursuant to

11 U.S.C. § 523(a)(2)(A) and/or § 523(a)(4).  For the reasons expressed below,

the relief sought by the plaintiff will be granted.

## PROCEDURAL HISTORY

The debtor, Len E. Epstein, filed a voluntary petition for relief under

Chapter 7 of the Bankruptcy Code on October 1, 2008.  As is relevant here, he

scheduled an unsecured claim held by his brother, Neil Epstein, with a

disputed value of $1.00.  The Chapter 7 trustee filed a Report of No

Distribution on December 31, 2008, and the debtor received his discharge on

January 16, 2009.

In the interim, before the debtor received his discharge, his brother, Neil

Epstein, filed this adversary complaint on January 12, 2009 seeking a

determination of nondischargeability on his disputed inheritance claim

pursuant to 11 U.S.C. § 523(a)(2)(A) and/or § 523(a)(4).  The plaintiff's

complaint arises from a prepetition civil action that he filed on October 5, 2007

in the New Jersey Superior Court, Chancery Division, Probate Part for Atlantic County, seeking a formal accounting from the debtor, both as the executor for their mother's estate and as the holder of a power of attorney for their mother before her death, and asking that the debtor's executor's commission be surcharged for his bad faith actions.  Following Len's bankruptcy filing, the state court appointed the plaintiff as limited administrator for his mother's estate, for the specific purpose of investigating and pursuing the decedent's estate's claims against the debtor in this court.

## **FACTS**

This case presents a picture of a complex and troubled family dynamic between Harriet Epstein and her three children:  her daughter Ellyn, and her two sons, Neil (the plaintiff) and Len (the debtor).[1]  Harriet executed her Last Will and Testament on September 29, 2003.  Her will provided that after the payment of her funeral expenses and costs of administration, the residue of her estate would be divided equally between her two sons.  She chose her son Len as her executor, and selected Neil as his alternate.  Her daughter, Ellyn

---

[1]       For ease, the plaintiff will be referred to as Neil, the debtor as Len, and the mother of the two parties as Harriet.

Epstein, was expressly excluded from the will.[2]

Some time in 2003, Neil moved in with his mother at her home at 400 Barclay Walk, Cherry Hill, New Jersey.  It is undisputed that while he lived with his mother, from 2003 to the spring of 2006, Neil was addicted to crack cocaine, was mostly unemployed, was convicted of a felony, and was incarcerated for a brief time.  During this period, Neil acknowledged that he would write checks out for his mother, claiming that, for the most part, the checks were written with the full knowledge and consent of his mother.  The checks were used to pay common bills, and to pay bills "that my mother would help me out with."[3]  Neil also acknowledged that some checks may have been written without Harriet's consent, and may have been used to buy drugs.

On June 29, 2005, Len and his mother Harriet filed a police report at the Cherry Hill Township Police Department.  The report was handwritten by Len, in the presence of and on behalf of his mother, and alleged that Neil was forging his mother's name on her checks so that he could cash them to support his drug habit.  The report filed stated that "[t]he sum that [Neil] has stolen

---

[2]     Len testified that Ellyn Epstein was charged by her mother with the safekeeping of $86,000 of Harriet's money several years earlier, but dissipated that fund on her own account.

[3]     T40-24 to 23 (7/8/2010).

from [Harriet] could be in excess of $50,000."[4]  Both Len and Harriet signed the

report.  Ultimately, Harriet declined to file charges against Neil.[5]


At some point prior to 2005, Harriet gave her son Len a Power of

Attorney.  On December 21, 2005, she executed a new Durable Power of

Attorney, in which she appointed Neil and her daughter, Ellyn, as her

attorneys-in-fact.  This new document specifically revoked all prior Powers of

Attorney signed by Harriet in favor of her son Len, effectively terminating Len's

authority as his mother's attorney-in-fact, and provided Ellyn and Neil with,

among other things, the authority to collect money, write checks, pay any and

all debts, and sell or rent property.[6]


Apparently as a result of his drug addiction, Neil suffered a stroke on or

about April 26, 2006 and was hospitalized for several days.  Upon his release,

Neil started on the road to recovery.  He moved out of his mother's home on

---

[4]        Exh. P-1.

[5]        The debtor produced approximately $32,000 of checks that he
alleged were wrongfully drawn by Neil on Harriet's bank account between
September 2004 and June 2005.  The checks were all signed with Harriet's
name.  Neil readily agreed that he wrote some checks on his mother's account
while he was living with her, but he denied that he signed these checks,
claiming that the checks were signed by his mother.

[6]        Len did not become aware of the new Power of Attorney until after
his mother's death.

May 13, 2006, attended a voluntary 28-day rehabilitation facility, and

remained drug free thereafter, except for a one-day relapse in November 2006.

Until the spring of 2006, Harriet's mortgage had been paid by a trust set

up for her by her brother.[7]  Because the trust was running out of funds, and

Harriet did not have sufficient assets or income to support herself without

access to the equity in her house, she decided to sell her house and move to an

assisted living facility.  Harriet moved into the Mey House in Egg Harbor

Township, New Jersey, some time in April of 2006, and Len put the house up

for sale.[8]

A purchaser was found for the house.  About three weeks before the

closing, a mortgage document dated July 14, 2006 was drafted, creating a

second mortgage on Harriet's home.  The second mortgage, in the amount of

$30,000, named Len as the mortgagee.  Len claims that his mother gave him

the mortgage to repay him, at least in part, for all of the funds that he had

expended over the preceding five years to help Harriet and Neil.  Len actually

---

[7]    The trust was known as the Bernard Stelman Trust FBO Harriet
Epstein.

[8]    Len testified that because Neil, who had 5 or 6 cats while he lived
with Harriet, caused extensive damage to the house, the house required a
massive and expensive clean-up effort, including the replacement of all the
rugs and other repairs.

signed the mortgage document for his mother, using her name, "at her direction."[9]  A few days later, on July 18, 2006, Len recorded the document in the Camden County Clerk's Office.

The closing on the house took place on August 3, 2006.  The sale price was $190,000.  After the payoff of the first mortgage and various settlement charges, Len's second mortgage of $30,000 was paid to him.  Harriet was not present at the closing.  Len signed the settlement sheet for his mother, as her attorney-in-fact.  Len also received the net proceeds from the sale of $88,806,77, and deposited the entire amount into his own bank account at Ocean City Home Bank.

Len asserts that several weeks after the closing, on September 18, 2006, his mother gifted him with $50,000.  According to Len, this "gift" was intended by Harriet to recognize the dissipation of Harriet's funds by Len's other siblings, and to "even things out"[10] among them.  The gift was not documented in any way.

For the next several months, Len paid Harriet's monthly expenses at the

---

[9]    T116-9 to 12.

[10]    T142-20 to T143-24.

assisted living facility from the proceeds of the sale of the house.  On January

7, 2007, Harriet passed away unexpectedly.  Len probated her will and received

letters testamentary on January 31, 2007.  Around that time, the two brothers,

Len and Neil, had a heated conversation about the proceeds of Harriet's estate.

At the time, Neil knew that he was entitled to 50% of the estate, but "was in

need of money",[11] and felt pressured by Len to accept a lesser amount.

According to Neil, Len threatened him with receiving nothing from the estate if

he did not consent to compromise the amount representing his share of the

estate.  In response to Neil's query about the size of the estate, Len responded

that the estate consisted of about $80,000 to $90,000, but he did not inform

Neil about either the $30,000 he received on account of the second mortgage

on their mother's home or the $50,000 he claims was gifted to him by their

mother several months earlier.  Neil also recalls that Len represented to him

that the sales price for the house was $170,000 rather than $190,000, and

that substantial sums had to be expended for repairs to accomplish the sale.


Neil testified that Len insisted on an immediate response to his

ultimatum, and that he felt that he "had about two seconds to come up with

---

[11]     T30-3.

the number."[12]  He responded with "$12,000."[13]  Len agreed to give Neil that amount, and immediately wrote Neil a check for $1,000 from his personal checking account.  According to Len, Neil had certain legal problems and needed immediate funds to retain counsel.  He directed Neil to prepare and sign a letter accepting the $12,000 as payment in full for his interest in the estate proceeds and releasing Harriet's estate from all future claims.  Neil drafted a letter to Len dated February 8, 2007 which provided:  "I am satisfied with the amount of $12,000 as settlement for my half of the estate of Harriet J. Epstein, our mother.  I will not seek any further funds from her estate upon receipt of the aforementioned monies."[14]  The letter was signed by both Neil and Len and was notarized, at which point Len wrote Neil a second check in the amount of $11,000, again from his personal checking account.

At some point after receiving the money, Neil reconsidered his actions and commenced a civil action in state court, seeking a formal accounting from his brother and the recovery of any monies due to him.  In this adversary complaint, Neil seeks a determination that his claim is nondischargeable under sections 523(a)(2)(A) and/or (a)(4).

---

[12]     T31-17to 18.

[13]     T32-1.

[14]     Exh. P-8.

## **DISCUSSION**

The burden under both 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4) is upon the plaintiff to prove his case by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 288, 111 S. Ct. 654, 660, 112 L. Ed.2d 755 (1991) ("Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions"); In re Freier, 604 F.3d 583, 587 (8th Cir. 2010) (preponderance standard applies to § 523(a)(2)(A)); In re Strack, 524 F.3d 493, 497 (4th Cir. 2008) (§ 523(a)(4)); In re Hilley, 124 Fed.Appx. 81, 82 (3d Cir. 2005) (§ 523(a)(2)(A)); In re Singer, No. 10-00045 (FLW), 2010 WL 3732944, *4 (D.N.J. Sept. 17, 2010).

Debts obtained through fraud are nondischargeable under 11 U.S.C. § 523(a)(2)(A), which provides that:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
> . . .
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

-10-

11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(A) conditions nondischargeability on the plaintiff's ability to establish that the debt in question was obtained as the result of the debtor's false pretenses, false representations or actual fraud.  The purpose behind this provision is "'to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors.'"  In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000) (quoting 4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, ¶ 523.08[1][a] (15th Ed. Rev. 2000)).  Section 523(a)(2)(A) was designed to cover frauds which involve "moral turpitude or intentional wrong"; "'fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient.'"  In re Bailey, 34 Fed.Appx. 150, *1 (5th Cir. 2002) (quoting In re Allison, 560 F.2d 481, 483 (5th Cir. 1992)); In re Reath, 368 B.R. 415, 422 (Bankr. D.N.J. 2006).

Section 523(a)(2)(A) does not define the terms "false pretenses", "false representation" or "actual fraud".  In fashioning a standard, some courts have determined that a false representation or false pretense, for purposes of section 523(a)(2)(A), involves:  "(1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party."  In re Allison, 960 F.2d 481, 483 (5th Cir. 1992); RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995).  See In re Suarez, No. 08-15732, 2010 WL

-11-

1382110, *15 (Bankr. D.N.J. Apr. 5, 2010) (false pretenses or a false

representation involves creating a "false impression" or making a "false or

misleading statement about something").  Actual fraud "'consists of any deceit,

artifice, trick, or design involving direct and active operation of the mind, used

to circumvent and cheat another--something said, done or omitted with the

design of perpetuating what is known to be a cheat or deception.'"

RecoverEdge L.P., 44 F.3d at 1293 (quoting 4 LAWRENCE P. KING, COLLIER ON

BANKRUPTCY ¶ 523.08[1][e] at 523-44 (15th Ed. Rev. 1997)).  See also In re

Bashlow Realty Co. v. Zakai, No. 08-2040, 2010 WL 1529568, *7 n.1 (Bankr.

D.N.J. Apr. 14, 2010) (identifying actual fraud as "more expansive than a mere

misrepresentation").


On this record, the conclusion is inescapable that Len perpetrated a

fraud against his mother, against his mother's estate, and against his brother

Neil in claiming most of the proceeds from the sale of his mother's home and

failing to inform Neil about what he had done before distributing Neil's share of

the decedent's estate.  While he contends that both the second mortgage of

$30,000 and the "gift" of $50,000 were afforded to him by his mother and at

her direction, the former to compensate him for past expenditures he made on

behalf of the family, and the latter to "even things out" between the siblings,

the circumstances of each transaction do not support Neil's version of events.

Rather, the circumstances evidence acts of deception by Len designed to circumvent and cheat his brother and insure a maximum recovery of assets for himself.

As to the $30,000 second mortgage, Len listed approximately $32,000 in moneys he expended on behalf of his mother, his deceased father, who died on January 22, 2002, and his brother Neil over the course of the five years preceding the mortgage. Most of the money was expended from 2001 through 2003, over three years before the mortgage was documented.[15] The expenses were primarily loans to his mother for household expenses, mostly incurred shortly after Len's father's death, and loans to Neil, at his parents' request, including a payment of $10,200 in February 2001 toward the mortgage on Neil's home. Apparently, after Len's father died, Harriet received the proceeds of a $100,000 life insurance policy, but there was no explanation offered as to why the proceeds were not used to repay the various "loans" to Len.

While Len testified that he expended the funds "out of the goodness of his heart",[16] he reflected in a statement appended to an informal accounting he

---

[15]    Only $1,714.70 of the amounts listed was expended in 2004, 2005 and 2006.

[16]    T120-10 to 11.

-13-

provided to the state court that he had an "oral agreement" with his parents that he would be reimbursed when his mother's condominium was sold.[17]  If that were true, i.e., that there was a binding oral understanding among the family,[18] then there would have been no reason to draft and record a second mortgage shortly before the closing.  Presumably, the money would have been paid to Len directly by his mother after the closing, without the need for formal documentation.

Also suspect is Len's testimony that he signed the mortgage in the presence of his mother, his neighbor, and his attorney in his attorney's office, and that his mother asked him to sign her name on the document, which he did.  This version of events is highly implausible.  It must be recalled that Harriet signed a new Power of Attorney approximately eight months earlier, substituting Neil and Ellyn as attorneys-in-fact for Len, and revoking Len's Power of Attorney.  By all accounts, up to her death in January 2007, Harriet was of sound mind and was reasonably competent.  If she was present at the attorney's office and had previously revoked Len's Power of Attorney, it makes no sense for her to have directed Len to sign the document for her.  Even more

---

[17]    Exh. P-4.

[18]    Neil testified that neither his parents nor his brother Len ever spoke to him about an agreement to repay, and that he did not hear about the mortgage until after he filed suit against Len in Atlantic County.

noteworthy in this regard is the fact that Len signed the document as "Harriet Epstein" rather than as "Harriet Epstein, by her attorney-in-fact, Len Epstein". I cannot believe that the attorney presiding over this transaction would have sanctioned this misrepresentation, and would have notarized the improperly executed document, rather than simply directing Harriet to sign, or instructing Len to sign for Harriet as her attorney-in-fact.

As to the $50,000 "gift", there is no documentation of any sort relating to it. In fact, it appears that there was no transaction involving this alleged transfer, because, in addition to the $30,000 he received on account of his second mortgage, Len received all of the proceeds from the sale ($88,806.77) and deposited the entire amount into his personal bank account. Yet when Len was asked at trial about the manner in which the gift was given, he could not recall whether Harriet wrote him a check, or whether he signed a check for her. The reality appears to be that there was no check written. The funds simply remained in Len's personal account. While he paid some of Harriet's expenses directly from this account before her death, including the monthly charge for the assisted living facility and Harriet's personal expenses ($18,368), paid her funeral expenses ($11,914.03), and gave Neil $12,000, he simply kept

the rest of the proceeds for himself.[19]

As well, Len testified that the purpose of the "gift" was his mother's desire to recognize him as "an excellent son"[20] for helping her, and to "even things out"[21] between the siblings, in light of the alleged defalcation of $86,000 by Ellyn years earlier, and the alleged defalcation by Neil of upwards of $50,000 while he lived with Harriet.  But this explanation of Harriet's intention is suspect for several reasons.  First, if she was truly interested in "evening things out" among the siblings, one would assume that she would have amended her will, which she did not do.  More noteworthy is the fact that if she gifted Len with $50,000 in September 2006, that gift effectively exhausted Harriet's remaining assets and left her with nominal resources to support herself.  In September 2006, Harriet was in relatively good health.  Her death in January 2007 was unexpected.  We are told that the reason she sold her home and moved to an assisted living facility was because the trust set up by her brother for her, which was paying her mortgage, was nearly exhausted.  Her only source of income at that point was Social Security payments, and her only

---

[19]      Proceeds received by Len -        $118,806.77
          Listed expenditures -            $  42,282.03
          Net proceeds retained by Len -   $  76,524.74

[20]      T141-21 to 22.

[21]      T142-20 to T143-2.

asset was the proceeds from the sale of her home.  That she would gift away a

sizeable portion of the remaining proceeds, rather than utilize a will codicil to

"even things out" when she passed, is also highly implausible.[22]

There is no question that the debtor's drafting of a second mortgage on

his mother's house, his deposit of the remaining house proceeds into his

personal account, and his failure to disclose these acts to his brother, the only

other beneficiary under his mother's will, constituted acts of fraud within the

meaning of § 523(a)(2)(A).  As noted above, § 523(a)(2)(A) distinguishes between

a "false representation" and "actual fraud".  To establish a "false

representation" elements of intent, reliance and materiality must be

established.  See, e.g., Field v. Mans, 516 U.S. 59, 68, 116 S. Ct. 437, 443, 133

L.Ed. 2d 351 (1995).  The term "actual fraud" has been interpreted to be

broader than misrepresentation.  See, e.g., McClellan v. Cantrell, 217 F.3d 890,

892-93 (7th Cir. 2000).  See also In re Kiesewetter, 391 B.R. 740, 746 (Bankr.

W.D. Pa. 2008).  The McClellan court described actual fraud as follows:

---

[22]      Len's credibility regarding the $50,000 "gift" was also tested by his
contradictory testimony regarding the timing of the gift.  On his informal
accounting, Len noted that the gift was received on September 18, 2006.  When
he first testified about the timing of the gift, he testified that he did not know
about the gift before the house was sold in August 2006. Len subsequently
contradicted himself, recalling that his mother told him, before the house was
sold, that he would receive the gift.

> Fraud is a generic term, which embraces all the multifarious
> means which human ingenuity can devise and which are resorted
> to by one individual to gain an advantage over another by false
> suggestions or by the suppression of truth.  No definite and
> invariable rule can be laid down as a general proposition defining
> fraud, and it includes all surprise, trick, cunning, dissembling, and
> any unfair way by which another is cheated.

McClellan, 217 F.3d at 893 (quoting Stapleton v. Holt, 250 P.2d 451, 453-54

(Okla. 1952).  The elements of misrepresentation and reliance need not be

established.  Id. at 894.  See also In re Vitanovich, 259 B.R. 873, 877 (6th Cir.

BAP 2001) ("When a debtor intentionally engages in a scheme to deprive or

cheat another of property or a legal right, that debtor has engaged in actual

fraud and is not entitled to the fresh start provided by the Bankruptcy Code.").

We have long understood that the Bankruptcy Code affords relief only to

the "honest but unfortunate debtor".   Cohen v. de la Cruz, 523 U.S. 213, 217-

18, 118 S. Ct. 1212, 1216, 140 L.Ed.2d 341 (1998).  Here, the debtor may not

shield himself from liability for having misappropriated his mother's assets, to

the detriment of his brother Neil, by receiving a discharge of this obligation.

I reach my conclusion that Len committed acts of fraud against Neil by

engaging in the transactions described herein with an understanding that Len

provided enormous assistance to his family, not only financially but in other

ways, during the years that Neil was in the throes of his drug addiction.  Len

described instances when Neil took Harriet's vehicle without permission, drove

it into Philadelphia, lost the keys and forgot where he parked the vehicle.

When these types of incidents occurred, it fell on Len to help his mother sort

out and resolve the situation, usually on an emergency basis.  Len did so,

apparently time and time again.  Len testified that it was "hell" dealing with a

cocaine addict, and he is most certainly correct to recall that his mother was

very grateful for his help.  One can speculate that Len believed he was entitled

to be reimbursed and compensated for his substantial contributions to the

family, and particularly to his mother, over the years.[23]  But his contributions

notwithstanding, Len was not entitled to simply take his mother's assets and

declare them to be his own.

To defend against the contention that the debt to Neil is

nondischargeable, Len focuses on the disclaimer executed by Neil to establish

that there is no debt due to Neil on account of Neil's share of his mother's

estate.  Len is correct that a beneficiary may renounce, disclaim or waive his or

her inheritance rights.  Under New Jersey law, while the testator's intention, as

---

[23]     Len acknowledged during the trial that he was not "okay" with the
provision in Harriet's will that divided the net proceeds equally between Len
and Neil, T124-19, and that he thought that the $12,000 he gave to Neil,
together with the $50,000 plus "confiscated" by Neil from their parents,
amounted to a fair share of his mother's assets for Neil.  T136-7 to 10.

expressed in her will, usually controls the disbursements to be made under a
will, N.J.S.A. 3B:3-33.1, all heirs retain the right to "disclaim" in whole or in
part a disbursement, or share in an estate, by filing a disclaimer with the
surrogate's office and delivering a copy of the disclaimer to the executor or
administrator.  N.J.S.A. 3B:9-2(a); 3B:9-6(a).  See, e.g., In re Estate of Schock,
226 N.J. Super. 67, 543 A.2d 488 (Law Div. 1988) (allowing a partial disclaimer
even if the sole purpose was to avoid taxes); In re Estate of Horowitz, 220 N.J.
Super. 300, 531 A.2d 1364 (Law Div. 1987) (same).  A proposed disclaimer is
required to be in writing, signed and acknowledged by the person disclaiming
the interest.  N.J.S.A. 3B:9-3.  It is filed with the surrogate and recorded in the
appropriate book.  N.J.S.A. 3B:9-6.  See Herman v. Baldwin, 10 N.J. Tax 348,
350 (Tax 1989) (recognizing that disclaimers are to be filed in the surrogate's
office or with the Superior Court).  The disclaimer must describe the interest
disclaimed and the extent of the renunciation, and it is binding on the party
making the disclaimer.  N.J.S.A. 3B:9-10.


        In the disclaimer under review here, written as a letter from Neil to his
brother, Neil agreed to accept $12,000 in place of the 50% share in his
mother's estate that he was due under her will.  He also agreed not to seek
further funds from the estate.  The disclaimer is signed and dated by both
parties and appropriately notarized.  In this regard, it conforms with the

-20-

statutory requirements for a valid disclaimer. It was delivered to the executor

for the decedent's estate. The fact that the disclaimer was not recorded might

not be an invalidating element here, in light of the participation of both Neil

and Len, the only two beneficiaries of Harriet's estate, in the execution of the

disclaimer.

Neil challenges the disclaimer as the product of duress or coercion, and

that it was executed without knowledge by Neil of the fraud that was

perpetrated by Len in misappropriating his mother's assets. The enforceability

of the disclaimer depends upon whether Neil has established that the

disclaimer "was procured by fraud, overreaching, duress, or coercion: the

agreement's terms were fully disclosed and accepted, and its terms are not

unconscionable." Ward-Gallagher v. Gallagher, 2010 WL 3257916, *6 (N.J.

App. Div. Aug. 13, 2010) (citing to Rogers v. Gordon, 404 N.J. Super. 213, 219,

961 A.2d 11, 15 (App. Div. 2008)). New Jersey courts have routinely held that

"when a settlement is obtained by fraud, the injured party may seek

rescission." Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143, 146

(1990). See also Lucas Development, LLC v. Lucas Bros., Inc., 2008 WL

2330196, *5 (N.J. App. Div. June 9, 2008). Where a party "is induced by

either a fraudulent or a material misrepresentation by the other party upon

which the recipient is justified in relying,'" the agreement between the parties is

voidable at the plaintiff's option.  Belani v. Grover, 2009 WL 4255493, *6 (N.J.

App. Div. Nov. 25, 2009) (quoting Restatement (Second) of Contracts § 164(1)

(1981)).  Rescission is available to a plaintiff  "based upon either legal or

equitable fraud."  Lucas Development, 2008 WL 2330196 at *5.  "Because legal

fraud encompasses the additional element of proof that the party who made the

representation did so with knowledge of its falsity, whatever constitutes legal

fraud will also constitute equitable fraud."  Belani, 2009 WL 4255493 at *6.

See Jewish Center of Sussex Cty v. Whale, 86 N.J. 619, 625, 432 A.2d 521,

524 (1981) ("(w)hatever would be fraudulent at law will be so in equity").


     In light of my determination that by his misappropriation of his mother's

funds and his failure to disclose his actions to his brother, Len committed acts

of fraud against Neil, I can readily conclude that the disclaimer may be

revoked, and does not serve as an impediment to the assertion by Neil of his

claim against Len.


## **CONCLUSION**


     The plaintiff's claim against the debtor herein is deemed to be

nondischargeable.[24]  By the post-trial submission of the plaintiff, I am invited to liquidate the plaintiff's claim against the debtor on this record.  I believe it is more appropriate to return the matter to the court in which the matter was pending at the time the bankruptcy case was filed, for several reasons.  First, I note that the debtor, as executor of the estate of Harriet Epstein, has an unresolved five-count counterclaim against the plaintiff in the probate matter, charging the plaintiff with fraud and forgery, conversion, tortious damage to property and defamation.  The counterclaim seeks damages from the plaintiff, which, if established, may serve as a setoff to any claim by the plaintiff against the debtor.  Second, there are open questions about the monies handled by the debtor on behalf of his mother before her death, including any monies received from the Bernard Stelman Trust, Society Security checks, and Harriet's bank accounts.[25]  The process of providing a formal accounting, particularly of funds handled by Len prior to Harriet's death, was not completed, either in this court or the state court.  Nor was the issue of whether the executor's commission

---

[24]     I need not address the alternate ground for nondischargeability, § 523(a)(4), in light of this conclusion.

[25]     Following the trial, Len's counsel submitted a copy of one page of a bank account statement belonging to Harriet dated January 23, 2007.  The statement raises more questions than it answers.  The statement reflects that the balance in her checking account as of January 23, 2007 was $140.11.  The balance as of January 7, 2007 appears to have been $2,789.76 following a deposit of $1,131.00 from an unknown source on January 4th.  Two days later, on January 9, 2007, a check in the amount of $2,300 was posted.  The recipient of this check is not known.

should be surcharged resolved.  For these reasons, I conclude only that the

debt to the plaintiff due from the debtor is nondischargeable, and leave the

liquidation of the claim asserted to further proceedings before the New Jersey

Superior Court.


      Counsel for the plaintiff shall submit an order in conformance with this

opinion.


Dated:      February 14, 2011

                  JUDITH H. WIZMUR
                  CHIEF JUDGE
                  U.S. BANKRUPTCY COURT